Englert, Exrx., Appellant, *v.* First National Bank at Pittsburgh, Appellant.

298

Argued January 5, 1939.   Before SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Gifford K. Wright,* of *Alter, Wright & Barron,* with him *James K. Ruby,* for appellant, No. 47, and for appellee, No. 52.

*W. W. Stoner* and *John A. Metz, Jr.*, with them *J. M. Stoner & Sons,* and *John A. Metz,* for appellant, No. 52, and for appellee, No. 47.

OPINION BY MR. JUSTICE LINN, March 22, 1939:

The appeal at No. 47 is from a decree setting aside a sale of collateral made by defendant bank to itself. The appellee-plaintiff* has fairly stated the question for review: "Did the acts of the pledgee bank, as shown by the evidence, by which it claims that it acquired absolute title to the pledged securities, constitute a 'private sale' of the securities within the meaning of the collateral note?"

April 1, 1932, defendant loaned Milton S. Englert $120,000 on his collateral demand note. The security consisted of stocks and bonds delivered to defendant in transferable form. The note provided that, on default, "full power and authority are hereby given to the holder hereof to sell, assign and deliver the whole of the said securities, or any part thereof, . . . at any brokers' Board, or at public or private sale, at the option of said holder, without either demand, advertisement or notice of any kind, all of which are hereby expressly waived. At any such sale the holder hereof may himself or itself purchase the whole, or any part of the property sold, free from any right of redemption on the part of the undersigned, which is hereby waived and released."

The default is conceded. The seventh finding of fact is: "7. In reply to the demands of the defendant for payments of interest and principal, Englert advised the defendant that he was unable to comply with the demands, had no additional collateral to put up to secure the loan, and placed the matter entirely in the hands of

* The bill was filed July 6, 1936, by Milton S. Englert, who died in 1937, before the case was tried; his executrix was substituted and prosecuted the suit. As we have concluded that the bill must be dismissed, it is unnecessary to consider her appeal at No. 52, March Term, 1939.

the defendant. On one occasion, shortly prior to April 8, 1935, Englert called upon the president of the defendant bank and stated to him that he was unable to make any payment, 'that he was through.' "

On April 8, 1935, defendant wrote to Englert as follows:

"We hereby make demand for payment of your indebtedness to this bank, as evidenced by your demand collateral note dated April 1, 1932, in the amount of $120,000.00 on or before Tuesday, April 16, 1935 at 3 o'clock, p. m.

"Unless said indebtedness is paid in full, we will proceed at that time to offer the following collateral securing said note at private sale at this Bank: [Here is inserted a list of the securities.]

"At the private sale, we will purchase the said collateral at the closing price on the New York Stock Exchange, New York Over the Counter, New York Curb Exchange, Pittsburgh Stock Exchange, Pittsburgh Over the Counter for April 16, 1935, and if no sale at that date at the last closing bid, or at prices quoted by Brokers or Dealers in Securities, whom we believe to be reliable, unless at the time appointed we receive a bona fide offer for said collateral or any part thereof, in excess of said closing price or bid, such offer being accompanied by cash, certified check on a bank satisfactory to us or other form of payment equivalent thereto, which offer we will either accept or purchase the collateral ourselves at the prices so offered, and shall look to you for payment of any deficiency arising on account of said sale. . . ."

To this demand Englert replied, April 11, asking for delay but stating in substance that he was unable to pay or to add to the collateral. The bank acted pursuant to its notice of April 8. On April 16 the manager of defendant's discount department made a list of the collateral with values; on the morning of April 17 he checked them with the New York Stock Exchange clos-

ing prices of the preceding day. Another finding is: "The values not obtained through this method (i. e.; of unlisted stocks and bonds) were ascertained by inquiry from brokers or other informed persons, and these prices were set forth after the particular security. The values and prices were arrived at in accordance with the method outlined in the letter of April 8, 1935." This list, reciting, "These securities are being purchased and will be carried in our investment account," was submitted to defendant's Finance Committee on that date, "and," in the words of the 14th finding, "each of the members of said Committee on said date approved the action . . . [described above] . . . The Finance Committee also passed a resolution approving such purchase." As the learned chancellor, a number of times during the course of his adjudication, is careful to repeat that defendant acted in good faith, the 15th finding may be quoted as representative: "15. The values placed upon the securities by the manager of the discount department of the defendant were made in good faith, and there was no fraudulent conduct in the transaction by the defendant or its officers, directors, or employees." The 16th and 17th findings included the following: "16. The defendant, on April 18, 1935, caused to be entered into its investment ledger as property belonging to it the various stocks and bonds pledged by Englert on said collateral note. Defendant gave credit to said Englert upon his note in an amount of money which was the aggregate of the values or prices which had been placed thereon by the manager of the discount department, and made a charge against the said Englert in the sum of $11,595.06 [balance due].

"17. The defendant, on April 17, 1935, notified Englert by letter that it had purchased at private sale the securities held by it as collateral for the indebtedness, and set forth in the letter a list of the securities, the values thereof, the total value, and a statement showing the amount of the note, interest thereon to April 16,

1935, stamp tax, proceeds from the sale of the securities, and the balance ($11,595.06) claimed to be due from Englert to it."

On May 25, May 29 and June 22, 1935, Englert wrote to the defendant "expressing a desire that some arrangement might be made concerning his indebtedness. The defendant's officers regarded the suggestions as too indefinite and refused to consider them."

July 3, 1935, Englert, pursuant to an arrangement made by him with a broker, tendered defendant a check for the amount said to be due, which defendant refused to accept. As the decree must be reversed, it is unnecessary to make further reference to this tender.

The evidence supports the findings of fact which show that the defendant proceeded within the letter and the spirit of the contract and that there was a private sale. The decree can therefore not be sustained. We assume counsel for plaintiff have stated all that can be said in support of the decree; their position is put in various forms: "the pledgee bank attempted to transfer these securities to itself by means of mere book entries—without any semblance of a private sale"; there was "not even a pretense of a sale"; "the transaction was accomplished from start to finish by mere book entries."

Englert had authorized defendant, inter alia, to sell at private sale and "itself [to] purchase . . . [the property] free from any right of redemption . . . which is hereby waived and released"; defendant was vested with a power of sale coupled with an interest; it had title to and possession of the securities.

The inquiry, then, is, were the steps taken by defendant to convert its qualified title into an absolute title, authorized by the contract. Englert had defaulted and, "prior to April 8, 1935," had told the defendant "that he was through." On that date defendant demanded payment on or before April 16, 1935, at 3 o'clock p. m. Defendant notified him that unless the note was paid the collateral would be sold "at private sale at this Bank"

and that the defendant "will purchase" it "at the closing price . . . for April 16, 1935," reported from the various Exchanges, etc., mentioned in the finding of fact quoted above, "unless at the time appointed we receive a bona fide offer for said collateral or any part thereof, in excess of said closing price or bid, . . . which offer we will either accept or purchase the collateral ourselves at the prices so offered, and shall look to you for payment of any deficiency arising on account of said sale. . . ."

There was ample notice of the proposed private sale at a time and place fixed; Englert was advised that the power would be exercised in a detailed way; he was informed the bank would purchase at the market price determined by recognized standards set forth, unless a bona fide offer "in excess of said closing price or bid" was received, and even if such an offer was made, Englert must further understand that if the bank rejected the increased offer, the bank itself would take the property at that offer. Up to this point in the transaction Englert had perhaps received more consideration than the words of his contract reserved to himself, having agreed that there might be "private sale, at the option of said holder, without either demand, advertisement or notice of any kind, all of which are hereby expressly waived." Not only was he advised of the time and place of the sale, but he had defendant's offer for the property —the market price—whatever it might be on April 16th, unless more were offered by another, in which event, the bank would accept it. Assuming, though not deciding, that he was then entitled to be heard on the point, one inquires why, in the intervening eight days, he did not object to the course proposed if it was objectionable. The default continuing, the bank did what it had notified him it would do: prepared the list, ascertained the market values in the manner specified, credited Englert's account pro tanto, and had the transfers to itself made absolute. This, we think, was sufficient, under the terms

of the contract, to require us to conclude that there was a valid private sale. Englert was given opportunity to produce bidders to compete with the offer made by the bank but he did nothing; it was not necessary, as appellee suggests, that defendant should bring in "one or more third persons other than the pledgor or pledgee"; the notice of sale did not lead him to think that appellant would do so. As he did not appear in person or by agent at the time and place specified, defendant was entitled to assume his assent to the transfer at the prices prevailing that day, as proposed; there was no occasion to do anything merely symbolical: Englert had put the defendant in possession of the securities by a valid title; his default authorized the exercise of the power of sale; to accomplish the sale required only what was sufficient to convert the qualified title into an absolute title; compare *Snyder v. Home Life Ins. Co.*, 328 Pa. 424, 195 A. 895; *Empire Nat. Bank v. High Grade Oil Co.*, 260 Pa. 255, 103 A. 602; *Colonial Trust Co. v. Central Trust Co.*, 243 Pa. 268, 90 A. 189; *Plucker v. Teller*, 174 Pa. 529, 34 A. 208; *Jeanes's Appeal*, 116 Pa. 573, 11 A. 862. Cases setting aside sales not made in accordance with the notice given by the holder of the collateral, support the appellant's position that a sale conducted pursuant to the contract and in accordance with the notice will be sustained: *Huntingdon Valley Trust Co. v. Norristown-Penn Trust Co.*, 329 Pa. 356, 196 A. 821; *Finley v. Insurance Finance Corp.*, 106 Pa. Superior Ct. 314, 163 A. 325. See generally, *Frey v. Farmers and Mechanics Bank*, 273 Mich. 284, 262 N. W. 911; *Hiscock v. Varick Bank*, 206 U. S. 28.

### No. 52

Since the conclusion reached in No. 47 disposes of the appeal in No. 52, it is unnecessary to set forth the questions raised in that appeal.

No. 47—Decree reversed and record remitted with instructions to dismiss the bill at appellee's costs.

No. 52—Appeal dismissed.